## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 2:06CR00010 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **THOMAS WALLY HAYES**, | ) | By: James P. Jones |
| | ) | Chief United States District Judge |
| Defendant. | ) | |

*Jennifer R. Bockhorst, Assistant United States Attorney, Abingdon, Virginia, for United States; Paul G. Whetstone, Morristown, Tennessee, for Defendant.*

The defendant, convicted of a drug trafficking conspiracy, has moved for judgment of acquittal or a new trial. For the reasons stated hereafter, it is appropriate to deny the motions.

I

Following a two-day trial, the defendant, Thomas Wally Hayes, was convicted by a jury in this court of conspiring to possess with intent to distribute and distributing oxycodone, a controlled substance. 21 U.S.C.A. §§ 846, 841(b)(1)(C) (West 1999 & Supp. 2007). He has filed a Motion for Acquittal and a Motion for New Trial raising numerous questions regarding the validity of his conviction. These

motions have been argued and orally denied and this opinion more fully sets forth the reasons for that decision.

The evidence at trial showed as follows.

The defendant was charged with conspiring with Darryl Asher and Randall Middleton to illegally buy and sell tablets of Oxycontin, a prescription pain medication containing oxycodone. Middleton was a resident of Lee County, Virginia, and Asher lived near him for approximately three months, but otherwise resided in Tazewell, Tennessee, during the course of the conspiracy. Asher was first prescribed Oxycontin in 1996 to control pain from a construction accident and developed an addiction to the drug in 2002. At the height of his addiction, he took between ten and fifteen Oxycontin tablets per day, which he used by crushing and snorting them. At one point, Asher had a valid prescription from his doctor for approximately 336 Oxycontin tablets per month.

Asher testified at trial against the defendant as a cooperating witness after he had entered into an agreement with the government to plead guilty to taking part in the conspiracy. The evidence showed that Asher began selling Oxycontin to support his own addiction. During the course of the conspiracy, Asher was using and selling approximately seventy Oxycontin tablets per week. When he began selling Oxycontin in Virginia his main supplier was the defendant. However, Asher did not

Case 2:06-cr-00010-JPJ   Document 192   Filed 06/03/07   Page 2 of 22   Pageid#: 802

initially receive his supply of Oxycontin from the defendant. He testified that it had taken several months before the defendant trusted him. Asher testified that the two had been able to develop a relationship of trust because they had attended rooster fights on the weekends together.

Asher primarily sold drugs to Middleton, who purchased between ten to thirty tablets two to three times per week. When Asher was living in Tennessee, Middleton would travel from Virginia to purchase drugs from him and then return to Virginia to consume the drugs and distribute the remaining amount to others. Asher testified that the defendant had been the ultimate source for the drugs he supplied to Middleton. If Asher did not have enough Oxycontin to supply Middleton, he would contact the defendant and they would arrange to meet at various places near the defendant's home or place of work to pick up the drugs requested by Middleton. Asher gave the defendant cash for the tablets and usually paid him sixty dollars for each tablet. Asher in turn sold those tablets to Middleton for between sixty and seventy dollars each. Middleton would then provide Asher a certain number of tablets as payment for facilitating the transaction with the defendant.

At one point during the course of the conspiracy, Asher moved to Lee County in order to be closer to his primary customer, Middleton. During this time, Asher testified that the defendant had remained one of his sources for the Oxycontin he sold.

The evidence showed that the defendant had lived in Virginia for less than three months and then returned to Tazewell, Tennessee. After moving back to Tennessee, he continued to sell Middleton drugs for approximately a year, until Middleton was incarcerated.

After Asher was arrested for distributing Oxycontin, he testified at a bond hearing on May 8, 2006, that his only source of Oxycontin had been from his own prescription. He did not mention that the defendant was his main source for Oxycontin at that time. However, Asher testified at trial that he had not been candid during his bond hearing. Finally, Asher also testified that until just prior to his arrest in 2006 that the defendant had continued to supply him with Oxycontin.

Middleton also testified as a cooperating witness and corroborated much of Asher's testimony. Middleton became addicted to Oxycontin in 2001 after being prescribed it for injuries related to his work as a coal miner. He often traveled from his residence in Lee County to Tazewell, Tennessee, to purchase Oxycontin from Asher. Middleton testified that he had purchased the drugs from Asher on a routine basis starting in 2003 and continuing until his own arrest for distribution of Oxycontin. He stated that he had retained some of the Oxycontin for personal use, sold some, and gave some to his son, Wesley Middleton, to sell. Middleton also testified that he knew that the defendant was Asher's primary supplier of Oxycontin

and that the bulk of the Oxycontin he purchased came indirectly from the defendant. He also testified that on two occasions he had purchased Oxycontin directly from the defendant.

Wesley Middleton testified that he and his father had received Oxycontin from Asher on numerous occasions. He stated that he had been present on one occasion in July of 2004 when the defendant provided Oxycontin to his father.

All three cooperating witnesses testified that they hoped to receive a sentence reduction by testifying, but each also admitted understanding that such a reduction was at the discretion of the court. The government introduced into evidence the written plea agreements of all three witnesses. Each agreement contained the following statement regarding a requirement on the part of each cooperating witness to be cooperative and truthful:

> I agree that if the United States has any doubts concerning my truthfulness, I will take and pass a polygraph examination administered by an examiner chosen by the United States Attorney's Office as to any matter alleged in the charging document(s) and/or anything discussed in debriefing.

(Gov't Ex. 1-3.)

The defendant elected not to testify, but he called two inmates who were housed with the cooperating witnesses at the Roanoke City Jail. Roger Crowder testified that he had been housed with both Randall Middleton and the defendant at

the Roanoke City Jail. He stated that Randall Middleton had told him that "he ain't never met Thomas Hayes, or he ain't never bought drugs from Thomas Hayes." (Jan. 5, 2007 Tr. at 4.) Steve Knapp also testified that he was housed with both the defendant and Randall Middleton at the Roanoke City Jail. He claimed that Randall Middleton had told him that "he never dealt directly with Thomas Hayes." (*Id.* at 20.)

The defendant also called John Baldridge, a retail pharmacist, to testify that the defendant's prescription records from one pharmacy did not contain a prescription for Oxycontin. However, the defendant also sought to have Baldridge testify that the amount of Oxycontin medically prescribed to Asher was abnormally high and more than he could have reasonably consumed. After voir dire of the witness, the court ruled that he was not qualified to testify regarding whether Asher could have reasonably consumed the amount of Oxycontin prescribed to him.

During closing arguments, the government argued that the defendant was at "the top of the food chain" compared to the cooperating witnesses who testified against him. The government reasoned that unlike the cooperating witnesses who bought and sold drugs to sustain their addiction, the defendant did so exclusively for profit.

## II

To support his Motion for Judgment of Acquittal the defendant first contends there was insufficient evidence presented at trial to sustain his conviction. In deciding a motion for acquittal based on sufficiency of the evidence, the evidence and all inferences therefrom must be viewed in a light most favorable to the government. *See United States v. Dominguez*, 604 F.2d 304, 310 (4th Cir. 1979).

To find a defendant guilty of a conspiracy to distribute and to possess with intent to distribute a controlled substance the government must prove beyond a reasonable doubt that (1) there was an agreement between two or more persons to engage in conduct that violates federal drug law; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became part of the conspiracy. *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc).

The defendant argues that there was a lack of sufficient evidence to prove these elements beyond a reasonable doubt because the government's case consisted entirely of the testimony of three cooperating witnesses. The government readily conceded that it had no audio or video evidence of controlled buys in which the defendant participated. Moreover, each cooperating witness testified that he had hoped to receive a time reduction by cooperating with the government in this case.

Case 2:06-cr-00010-JPJ   Document 192   Filed 06/03/07   Page 7 of 22   Pageid#: 807

Although jurors are entitled to look at the testimony of cooperating witnesses with skepticism, a conviction may be based upon the testimony of such witnesses. Credibility determinations are exclusively within the purview of the jury. "The jury, not the . . . court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretations to believe." *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994) (citations omitted).

In this case, three witnesses testified that the defendant had either directly or indirectly supplied them with drugs. The defendant makes much of the testimony of Roger Crowder and Steve Knapp—the inmates who were housed with both Randall Middleton and the defendant. The defendant contends that the testimony of these two witnesses contradicts the testimony of Middleton and thus reveals that the evidence was insufficient to support his conviction. I disagree. Although the testimony of Middleton and the testimony of Crowder and Knapp were certainly in conflict, the jury was entitled to resolve any conflict in favor of the government. *See id.*

Even assuming that it was unreasonable for the jury to believe the testimony of Middleton over that of Crowder and Knapp, there was still sufficient evidence presented to support the defendant's conviction. The testimony of Asher and Wesley Middleton was not controverted by these two witnesses. Asher testified that the

Case 2:06-cr-00010-JPJ   Document 192   Filed 06/03/07   Page 8 of 22   Pageid#: 808

defendant had supplied him copious amounts of Oxycontin during the course of the conspiracy. Indeed, he testified that the defendant only began supplying him with drugs after the two had established a relationship of trust in 2003. Asher noted that the defendant continued to supply him with drugs to sale in Virginia up until the time of his arrest in May of 2006.

Wesley Middleton also verified that Asher typically supplied him and his father with drugs and that these drugs originated from the defendant. Additionally, he stated that he personally witnessed the defendant distribute drugs on one occasion while in Tennessee.

The sum of the testimony of Asher and Wesley Middleton taken in a light most favorable to the government provided more than a sufficient basis to conclude that there was an agreement between the defendant, Asher, and Randall Middleton to distribute Oxycontin and possess with intent to distribute Oxycontin in Lee County, that the defendant knew of this conspiracy, and that he knowingly and voluntarily became part of it.

"Once it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992) (citation omitted). The evidence not only provided the jury with an ample basis to conclude

-9-

that a drug conspiracy existed, but also showed that the defendant had a substantial connection to it. Each cooperating witness stated that he had personally bought or observed the defendant distribute Oxycontin. The evidence taken in a light most favorable to the government revealed that the defendant was the primary source of a large amount of drugs flowing into Lee County. Even though there were questions regarding the motives of the cooperating witnesses in testifying as they did,[1] the jury was entitled to concluded that their testimony was credible. *Burgos*, 94 F.3d at 862. Accordingly, there was sufficient evidence to support each element of the charge of which the defendant was convicted.

The defendant further contends that there was insufficient evidence to support his conviction due to the fact that a material variance existed between the alleged life of the conspiracy as contained in the indictment and the evidence presented at trial. To support this argument the defendant claims that the government offered no proof that the Oxycontin exchanged by Asher during the September 9, 2005, controlled buy was provided to him by the defendant.

---

[1] The court instructed the jury that it was to consider the testimony of cooperating witnesses with more caution than the testimony of other witnesses because their testimony may be motivated by a hope of gaining favor with the government and in turn receiving reductions in their sentences.

There is no requirement that the government prove that an alleged crime occurred on the exact dates alleged in the charging instrument. Rather, it is sufficient if the government only shows that it occurred on a date reasonably near the date stated in the indictment. *United States v. Tsinhnahijinnie*, 112 F.3d 988, 991 (9th Cir. 1997). The indictment alleges that the conspiracy existed between September 2003 and September 9, 2005. Asher testified that the defendant had continued to supply him with drugs until his arrest in May of 2006. The jury did not have to find that the actual dates of the conspiracy coincided with the dates alleged in the indictment "so long as the time frame alleged places the defendant sufficiently on notice of the acts with which he is charged." *United States v. Queen*, 132 F.3d 991, 999 (4th Cir. 1997). The fact that the government did not attempt to prove that the ten Oxycontin tablets that were sold to the government informant on September 9, 2005, originated with the defendant does not show that a material variance existed between the dates of the conspiracy alleged in the indictment and the dates proven at trial.

Asher's testimony regarding the approximate dates that the defendant sold him drugs allowed the jury to reasonably conclude that a conspiracy existed within the time frame alleged in the indictment.

-11-

III

Aside from his sufficiency of the evidence argument, the defendant also raises numerous other grounds in his Motion for Judgment of Acquittal. Each ground will be addressed in turn.

The defendant claims that jury misconduct entitles him to a judgment of acquittal or alternatively a new trial in this case. This argument has been fully addressed in my prior opinion denying the defendant's Motion to Interview Jurors. *See United States v. Hayes*, No. 2:06CR00010, 2007 WL 527660 (W.D. Va. Feb. 15, 2007). For the reasons stated in that opinion, the alleged jury misconduct does not serve as a basis for a judgment of acquittal or a new trial in this case.

The defendant also claims a judgment of acquittal is required because there was no evidence introduced by the government that established where he lived and thus, venue was not proved by a preponderance of the evidence. This argument is frivolous. Although the defendant has a constitutional right to be tried in the district in which the crime was committed and the government must prove venue by a preponderance of the evidence, the defendant's residency is irrelevant to establishing venue in a criminal case. *See United States v. Griley*, 814 F.2d 967, 973 (4th Cir. 1987).

-12-

Venue is not established by the defendant's place of residence. Rather, venue is proper in any district where a crime was begun, continued, or completed. 18 U.S.C.A. § 3237(a) (West 2000). The evidence established that the defendant conspired to distribute Oxycontin in Lee County, Virginia. Accordingly, venue was proper in this district.

The defendant next argues that a judgment of acquittal should be granted because the government did not prove by expert testimony that the tablets distributed during the course of the conspiracy were in fact Oxycontin. This argument is equally without merit. It is well established that neither expert chemical analysis nor expert testimony is necessary for the jury to conclude that the substance at issue was in fact a controlled substance. *United States v. Dolan*, 544 F.2d 1219, 1221 (4th Cir. 1976). The record reveals that there was sufficient proof to establish that the tablets at issue were in fact Oxycontin.

IV

The defendant contends that certain errors at trial entitle him to a new trial.[2] He first claims that it was an abuse of discretion for the court to prevent his expert

---

[2] One of the grounds—that a witness commented on the defendant's status as a probationer—has been withdrawn. The defendant now agrees that there was no such testimony.

-13-

witness from testifying that Asher's prescription of Oxycontin was abnormally high for a person with Asher's ailments.  Under the rules of evidence, a witness may be qualified as an expert only if he or she has specialized knowledge of the matter before the court. *See* Fed. R. Evid. 702 ("[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . .")

"The qualification of an expert witness is committed to the discretion of the trial judge. [The court] is not required to accept as an expert every witness who professes to be one.   [The court] is not required to accept as an expert opinion the speculation of every lay witness who is willing to venture it." *Swift v. S. Ry. Co.* 307 F.2d 315, 320 (4th Cir. 1962).

The defendant presented John Baldridge, a retail pharmacist, as an expert witness to testify that Asher's prescription was abnormally high for someone in his physical condition and that he could not have reasonably consumed the amount of Oxycontin prescribed to him.  Asher testified that his physician had prescribed him 336 tablets per month and that he had consumed between ten and fifteen tablets per day.   He also stated that over time he had become increasingly dependent on Oxycontin and required a greater quantity as his body adapted to the drug.

-14-

Voir dire revealed that Baldridge was a retail pharmacist and not the pharmacist who had filled Asher's prescriptions. As a pharmacist, Baldridge was qualified to testify about Oxycontin generally. However, he was not qualified to testify about whether Asher could have consumed the amount of Oxycontin prescribed to him. He was not a medical doctor and had no specialized knowledge or experience regarding the amount of pain medicine necessary to treat an individual with the same ailments as Asher. While it may have been proper for a medical doctor to opine on the amount of Oxycontin an individual could reasonably consume, it was not shown that it was proper for this retail pharmacist to render an opinion on that subject.

The defendant next assigns error to the government's comment during closing argument that he was at "the top of the food chain." The defendant claims this statement was highly prejudicial because it inaccurately described his role in the conspiracy. This argument is unavailing. It should be noted that the defendant failed to raise any objection to the this comment at the time it was made. Furthermore, in light of the record, the comment was not unduly prejudicial to the defendant or a mischaracterization of the evidence.

I find it was a proper argument for the government to make in its summation. In closing statements, counsel is allowed latitude to present arguments based on

-15-

inferences reasonably drawn from the evidence. This argument was reasonably supported by the evidence. Again, the evidence established that the defendant was the primary source of the thousands of Oxycontin tablets that were supplied to Asher, and that Asher in turn distributed the bulk of these drugs to Randall and Wesley Middleton and others. Considering this arrangement, it was not improper for the government to argue that the defendant was the leading figure in the drug conspiracy—in other words, at the top of the food chain.

The defendant similarly contends that it was unduly prejudicial for the court to allow Asher to testify that the defendant attended rooster fights on the weekends. The introduction of this testimony was not unfairly prejudicial. First, Asher did not go into specific details about the sport of rooster fighting. Nor did he testify to the defendant's involvement in that sport. Asher testified that attending rooster fights with the defendant was the way he was able to gain his trust and begin purchasing drugs from him, an important part of the government's case.

The defendant also argues that a new trial should be granted because the government introduced the plea agreements of the three cooperating witnesses and these exhibits referenced the fact that the plea agreements were premised on the ability of each witness to take and pass a polygraph examination. The issue is

Case 2:06-cr-00010-JPJ   Document 192   Filed 06/03/07   Page 16 of 22   Pageid#: 816

whether the portion of the plea agreements referencing polygraph examinations was improperly admitted.

The Fourth Circuit has held that the introduction by the government of a plea agreement with a reference to possible polygraph testing constitutes improper bolstering of the witness's testimony and the reference should be redacted before the plea agreement is admitted as evidence. *See United States v. Herrera*, 832 F.2d 833, 835-36 (4th Cir. 1987); *United States v. Porter*, 821 F.2d 968, 974 (4th Cir. 1987); *see also United States v. Suarez-Milian*, Nos. 91-5158, -5159, 1992 WL 252495, at *8 (4th Cir. Oct. 5, 1992) (unpublished).

Because the defendant failed to make a timely objection to the introduction of these exhibits, he has forfeited any error in their admission.[3] Therefore, my review of this issue is limited.[4] Any error in admitting these plea agreements will be

---

[3] If the defendant had "waived" his right against admission of these exhibits, plain error review would not be possible regardless of the impact on the defendant's substantial rights. Failure to object to admission of evidence does not equate to a waiver of the error. Rather, the defendant is deemed to have forfeited the objection. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (citation omitted).

[4] Issues that a defendant fails to bring to the attention of the court during trial cannot be subsequently raised in post trial motions unless there was plain error. *See United States v. McBride,* 862 F.2d 1316, 1319 (8th Cir. 1988); *see also United States v. Jones,* 404 F. Supp. 529, 539 (E.D. Pa. 1975) ("In the absence of plain error, matters not called to the attention of the trial judge cannot be subsequently raised in the post trial stages of the proceeding.") (citations omitted).

analyzed under the plain error test. *See Olano*, 507 U.S. at 733 (holding that under the plain error test the defendant bears the burden of showing that there was an error during the trial that was plain and that affected his substantial rights). "Any error, defect, irregularity or variance which does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). Although the admission of these plea agreements was error and plainly precluded by this circuit's case law, I find that the admission did not impair the defendant's substantial rights.

Plain error review is comparable to harmless error review. Under both forms of review, the court examines the trial record to determine if the error was prejudicial to the defendant. *See Olano*, 507 U.S. at 734. Harmless error review is applicable where the defendant has actually made a timely objection to the error. The key distinction between these two forms of review is which side bears the burden of showing the impact of the error on the defendant's substantial rights. *Id.* Under plain error review, "the tables are turned on demonstrating the substantiality of any effect on a defendant's rights: the defendant who sat silent at trial has the burden to show that his 'substantial rights' were affected." *United States v. Vonn*, 535 U.S. 55, 62-63 (2002) (citation omitted).

Here, the defendant must show that the error was prejudicial. Accordingly, the error must have "affected the outcome" of the trial. *Olano,* 507 U.S. at 734. There

-18-

must be a concrete showing by the defendant that the admission of these plea agreements probably influenced the verdict. *See id.*

In analyzing the particular error of admitting plea agreements with references to polygraph examinations, the Fourth Circuit has examined the trial record to determine if there is any "reason to believe that an inference about a polygraph played any significant part in the jury's assessment of credibility." *Herrera*, 832 F.2d at 836. In the present case, I find there is no reason to believe that this portion of the plea agreements was critical to the jury's credibility determinations regarding the cooperating witnesses.

The government's case was based largely on the testimony of the cooperating witnesses whose plea bargains were admitted as exhibits. Therefore, any improper bolstering of the credibility of these witnesses by the government gives rise to a concern that the jury's verdict was influenced by such bolstering.

Critical to assessing any prejudice suffered by the defendant is the particular emphasis the government placed on the portion of the plea agreements at issue here. The government introduced the plea agreement of each cooperating witness—three in total. Each of the exhibits totaled between nine and ten pages while less than one paragraph of each referenced a polygraph examination. When introducing these exhibits through the cooperating witnesses, the government's only substantive

mention of the plea agreements was that they required the cooperating witness to tell the truth and that they allowed for a sentence reduction at the court's discretion.

Furthermore, during closing statements, only two references were made to the plea agreements and none specifically to polygraph examinations. First, to counter the defendant's argument that the cooperating witnesses had a motive to lie because certain charges had been dropped against them, the prosecutor referred to the plea agreements to inform the jury that although some counts had been dropped the conduct encompassed by those counts would be considered for purposes of sentencing. The government next referenced the plea agreements and stated as follows:

> Three different people have come before you under oath, pursuant to a plea agreement with the United States which says that they would not falsely implicate anyone in section six, and sets out the penalties for them if they do. They hope the judge will reduce their sentence. And they have a lot to lose if they lie. Their plea agreement goes away . . . all sorts of nasty things can happen to them.

(Jan. 5, 2007 Tr. at 44-45.)

At no point did the government mention that it could require the cooperating witnesses to submit to a polygraph examination. Nor did the government request the jury review the plea agreements. Other than the penalty of perjury and the ability to revoke the plea agreements, the government made no insinuation that it had any particular means to ensure the truthfulness of the witnesses. Thus, there was no

-20-

disproportionate emphasis placed on the portions of the plea agreements that should have been redacted.

Moreover, each of the cooperating witnesses was subjected to a long and intensive cross-examination. The court also instructed the jury that it should consider the testimony of cooperating witnesses with more caution than other witnesses because their testimony may be motivated by a hope of gaining favor with the government. *See Herrera*, 832 F.2d at 836. Accordingly, the defendant has failed to meet the third prong of the plain error test. *See United States v. Cedelle*, 89 F.3d 181, 185-86 (4th Cir. 1996) (stating that central to the question of determining whether a plain error has affected the defendant's substantial rights "is a determination of whether, based on the record in its entirety, the proceedings against the accused resulted in a fair and reliable determination of guilt.").

In light of all of these considerations, there is no reason to believe that these exhibits "played any significant part in the jury's assessment of credibility." *Herrera*, 832 F.2d at 836.


V

For the reasons stated, it is **ORDERED** that defendant's Motion for Judgment of Acquittal and Motion for a New Trial are DENIED.

ENTER: June 3, 2007

/s/ JAMES P. JONES
Chief United States District Judge